UNITED STATES of America,
Plaintiff-Appellee,

v.

Juan MacDOUGAL–PENA and Kingsley Rotardier, Defendants-Appellants.

Nos. 404, 405, Dockets 76–1320, 76–1343.

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1976.

Decided Dec. 1, 1976.

Sheila Ginsberg, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant MacDougal-Pena.

Paul B. Bergman, New York City (William P. Ford, New York City, on the brief), for appellant Rotardier.

T. Barry Kingham, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. of New York, Lawrence B. Pedowitz, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before MOORE, FEINBERG and MESKILL, Circuit Judges.

FEINBERG, Circuit Judge:

Kingsley Rotardier and Juan MacDougal-Pena appeal from judgments of conviction in the United States District Court for the Southern District of New York after a jury trial before Dudley B. Bonsal, J. Appellants were convicted under 18 U.S.C. §§ 371, 2314 of interstate transportation of stolen securities and stolen coins and of conspiracy to commit those crimes. Each defendant received concurrent three-year sentences on each count. Pena challenges his conviction on all counts; Rotardier appeals only from his conspiracy conviction. For reasons set forth below, we affirm the judgments of conviction.

I

From the evidence before it, the jury could have found the following facts: The securities and coins were stolen from two residences in St. Croix, Virgin Islands, owned by Caroline Swift. In April 1974, appellants, using aliases, and two other men moved into the downstairs apartment of one of these houses, known as Hill Villa. Mrs. Swift lived on the upper floor. About a month later, workmen delivered a fireproof filing cabinet to Mrs. Swift at Hill Villa, at a time when someone in defendants' downstairs apartment probably noticed the delivery. Thereafter, Mrs. Swift and her housekeeper, Viola Westerman, put securities, paperweights, and a gold and silver coin collection in the cabinet. Mrs. Swift also put valuable coins in a safe at her other house in St. Croix, known as the Chalet. On May 9, 1974, Mrs. Swift left for the United States.

On July 10, 1974, Viola Westerman discovered that someone had stolen rare coins from the safe in the Chalet and had tam-

pered with the locked filing cabinet at Hill Villa. She notified the police and Mrs. Swift. When the police came, defendants Rotardier and Pena were outside Hill Villa next to a Volkswagen van. The two men entered the van and disappeared from St. Croix.

The next day, both men appeared at Hayden, Stone, Inc., a New York City brokerage house, with securities stolen from Mrs. Swift. Rotardier and Pena were dressed in white suits and sandals. They were accompanied by one Harvey Bernstein, apparently a friend of Rotardier's and known to one of the Hayden, Stone employees. Pena did not join in the conversation but was present while Rotardier, passing himself off as "Steven Hyde-Swift," and Bernstein opened a joint brokerage account by pledging as collateral more than $35,000 of the stolen securities, all in the name of Stephen Hyde-Swift. Rotardier signed the name "Swift" to various documents. Hayden, Stone would not accept the other stocks, which were in the names of Caroline Swift or the Arthur M. Hyde Foundation.

While Hayden, Stone was attempting to verify the false information given by Rotardier, appellants were busy trying to sell a large quantity of coins. Rotardier and two men dressed in white suits went to a coin dealer in Manhattan and told him they had a large collection of coins coming from the Caribbean. Later in the week, one of them called the dealer from the airport and the three came to him later that day with large, heavy wooden crates of valuable coins. These were similar to the coins stolen from Mrs. Swift. The dealer bought the coins, issuing a check for $23,719.20 to "Kingsley Rotardier," who was staying at the Warwick Hotel. At the time, Rotardier lived at the Warwick, using the name "Wainwright." Staying with him was another person named "Wainwright." On at least two occasions between July 15 and 19, Rotardier and Pena were picked up outside the hotel by a limousine service and driven around New York. They wore tropical suits and sandals and paid the driver with $100 bills.

On August 8, Rotardier and Pena were arrested at the office of Hayden, Stone. Both carried false identification documents. They were indicted and tried shortly thereafter, but the trial ended in a hung jury. They were retried on a superseding indictment in May 1976, and convicted.

## II

■ Appellant Pena contends that there was not enough evidence to support his conviction on either the count charging conspiracy to transport or on the two substantive counts charging transportation of the stolen securities and coins. Pena's counsel argues that if Pena had been a woman living with Rotardier, the insufficiency of the evidence against Pena would be clear.[1] Even on this assumption, the argument fails. Pena lived with Rotardier at the time of the thefts and the latter, who sensibly does not contest his conviction on the substantive counts, could not have concealed the burglaries of Mrs. Swift's homes by himself. After appellants left the apartment, discarded coin books, several plastic coin containers and a silver platter of Mrs. Swift's were found there. The jury could have found that the apartment in which Pena and Rotardier lived had contained a large quantity of stolen merchandise, including more than 10,000 coins. Pena and Rotardier left shortly after the thefts were discovered[2] and both turned up at Hayden, Stone the next day in New York with stolen securities, when Rotardier, in Pena's presence, told a wholly false story to open an account. The jury could also have found that Pena helped deliver the crates of coins to the New York coin dealer. Counsel argues that Pena may have been ignorant of Rotardier's activities and may have thought that Rotardier left St. Croix to avoid eviction for non-payment of rent. On this theory, Pena merely left when Rotardier did, as a wife would, and then simply accompanied Rotardier to New York. This is possible,

but the jury could properly have believed that Pena knew what Rotardier was doing and was helping him. Similarly, Pena argues that there was no proof he had sufficient stake in the venture to justify finding him a participant in any conspiracy: The account at Hayden, Stone was not opened in Pena's name nor was he payee of the check given for the coins. The jury, however, was not bound by these formalities. It could properly have found that Pena expected to, and did, share in the period of high living in New York prior to the arrest.

Pena cites a number of cases to support his argument that the evidence that he was a co-conspirator was insufficient to go to the jury. E. g., *United States v. Johnson*, 513 F.2d 819, 823 (2d Cir. 1975); *United States v. Cirillo*, 499 F.2d 872, 883–85 (2d Cir. 1974); *United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963). We see no need to discuss all of these decisions. Each depends on its facts and none is controlling here. For example, in *United States v. Johnson*, supra, defendant was convicted of a narcotics conspiracy after he and his friend were stopped at the border and drugs were found in the friend's car. This court reversed because there was not "an iota of evidence" connecting Johnson to his friend's drug transactions. 513 F.2d at 823. Here, there was evidence connecting Pena to every stage of Rotardier's actions, from transportation of the stolen goods to their disposition.

We conclude, therefore, that the evidence as to Pena on the conspiracy count was sufficient. Pena's similar attack on the two substantive counts must also fail. He could properly have been found guilty, either on the theory of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), or on an aiding and abetting theory.

■ Pena also argues that the judge erred in his charge in two respects: first, by telling the jury that Pena's possession of

---

1. Counsel says that the record suggests a homosexual relationship, which supports the analogy.

2. Pena points out that a government witness placed Rotardier in New York before the July 10 date, but the jury was free to believe Mrs. Westerman that Pena and Rotardier left the Villa that day together.

the securities and coins would give rise to the inference of knowledge that the property was stolen, and second, by failing to instruct that mere presence at a crime even with knowledge would not of itself establish participation. In the trial court, Pena did not object to the former charge and apparently did not request the latter. Under the circumstances, we will not consider the points further. We do stress, as we recently did in *United States v. Erb*, 543 F.2d 438, 447 (2d Cir. 1976), that a *Garguilo*-type charge regarding presence and guilty knowledge[3] should be given, when appropriate, in the future whether requested or not.

◼ Finally, appellant Rotardier's arguments regarding the conspiracy conviction require little discussion. Delivery of the stolen securities and the coins in Manhattan were overt acts in furtherance of the conspiracy and established venue in the Southern District of New York. The contention that the conspiracy ended when the securities and the coins arrived at the airport in the Eastern District is without merit. *Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), is not to the contrary.[4] Rotardier's remaining argument that, absent Pena, there was proof of no other conspirator falls with our affirmance of Pena's conviction on the conspiracy count.

Judgments of conviction affirmed.[5]

---

**3.** See *United States v. Garguilo*, 310 F.2d 249, 254 (2d Cir. 1962); *United States v. Terrell*, 474 F.2d 872, 876 (2d Cir. 1973).

**4.** In *Bollenbach*, defendant did not transport the stolen goods across state lines, but was only the New York "fence." The Court reasoned that defendant could not be convicted for having conspired to transport securities across state lines "merely on proof that he . . . helped to dispose of the stolen securities after

the interstate transportation was concluded." 326 U.S. at 611, 66 S.Ct. at 404. This, of course, does not mean that the transporters, in delivering the goods to the fence, were not acting in furtherance of their conspiracy. *United States v. Turley*, 135 F.2d 867, 869 (2d Cir.), cert. denied, 320 U.S. 745, 64 S.Ct. 47, 88 L.Ed. 442 (1943).

**5.** We also deny Pena's motion for bail.